IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MARGARET KUCHY, ) | |
| ) | |
| Plaintiff, ) | CASE NO. : _____ |
| ) | |
| v. ) | |
| ) | JURY TRIAL REQUESTED |
| NIDUS DEVELOPMENT LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## COMPLAINT

Plaintiff Margaret Kuchy ("Ms. Kuchy" or "Plaintiff") files this complaint for relief and damages against Defendant Nidus Development LLC ("Nidus"). Plaintiff relies on the following allegations and causes of action:

## NATURE OF THE ACTION

1. This whistleblower action arises under the retaliation provision of the False Claims Act, 31 U.S.C.A. §3730(h)(1) ("False Claims Act" or "FCA"). Plaintiff took various steps to stop Defendant's violations of the False Claims Act that included fraudulent billing practices resulting in overpayments to Defendant from federal payors and false submissions of payroll information to obtain

1

government funds under the Paycheck Protection Program of 2020. Defendant's termination of Plaintiff was in retaliation for Plaintiff's opposition to its violations of the FCA. Plaintiff seeks back pay, front pay, lost benefits and remuneration, liquidated damages, special compensatory damages, and her attorneys' fees and costs of litigation.

## THE PARTIES

2. Plaintiff Kuchy is a citizen of the United States who was employed by Nidus during the events alleged in this complaint and who brings a claim based on events or omissions occurring in Henry County, Georgia.

3. Defendant Nidus is a private for-profit holding company in the health care sector that receives federal fees for the performance of services as defined by the False Claims Act, 31 U.S.C.A. §3729 *et. seq.*

4. During the time of the events alleged herein, Nidus Development owned and operated Fairview Urgent Care, a health care entity located in Ellenwood, Georgia in Henry County.

## SUBJECT MATTER JURISDICTION AND VENUE

5. Jurisdiction of this court is invoked pursuant to 28 U.S.C.A. §1331 and 31 U.S.C.A. §3732(a).

6. Venue is proper in this district and division under 37 U.S.C.A. §3732(a) as Defendant Nidus Development, through its subsidiary Fairview Urgent Care, resided in and transacted business in this judicial district within the Atlanta division.

## PERSONAL JURISDICTION

7. Defendant may be served with proper process concerning this civil action through its registered agent, C T Corporation System, at 1201 Peachtree St. NE, Atlanta, GA 30361.

## FACTUAL ALLEGATIONS

### Background information

8. Nidus is a New York-based real estate development company that specializes in mixed used space and healthcare facility design.

9. The CEO of Nidus is Dr. Greg Daniel. Dr. Daniel previously founded and led the Exigence Group, an organization that spanned various health care sectors from emergency care management to urgent care services to facilities management to construction of health care facilities. In 2012, Exigence was

3

acquired by TeamHealth. The real estate development division of Exigence subsequently merged with Nidus, and Dr. Daniel transitioned to his current role as CEO of Nidus.

10. In 2017, Nidus emulated the Exigence business model by opening an urgent care clinic in Ellenwood, Georgia, doing business under the name Fairview Urgent Care. Until December 2021, Fairview Urgent Care was entirely owned and controlled by Nidus.

11. Fairview Urgent Care is a freestanding clinic that provides inpatient nonemergency medical treatment.

12. The patients at Fairview Urgent Care were insured through private sector sources and public sector entities such as Medicare, Medicaid, and Tricare. Tricare is the insurer of active duty and retired members of the uniformed armed forces. As much as 40% of the patients at Fairview Urgent Care were Medicare, Medicaid, or Tricare beneficiaries.

13. Plaintiff Kuchy has a lengthy, nearly 25-year career integrating information technology with delivery of health care services. She has also developed substantial experience in areas related to health care management, including organization building, regulatory compliance, and patient care.

14. Ms. Kuchy was appointed Chief Information Officer for the Exigence Group in 2005 and transitioned to the same role at Nidus in 2013. In addition to her core responsibilities of creating and overseeing technology infrastructure at Exigence and Nidus, Ms. Kuchy exercised broad operational duties that included leadership of the hiring and recruiting process, budgeting, and maintenance of key performance analytics. Until 2020, Ms. Kuchy was designated for tax purposes as an independent contractor for Nidus rather than as a salaried employee.

15. As an element of her roles at Exigence and Nidus, Ms. Kuchy managed the installation of technology systems at new facilities, including Fairview Urgent Care. As a general practice, Ms. Kuchy did not maintain an ongoing operational role with startup clinics, which had their own respective clinic administrators.

16. Fairview Urgent Care experienced significant turnover in the clinic administrator position. As a result, Ms. Kuchy was increasingly tasked beginning in 2018 with overseeing property management, staff hiring, and payor contract negotiations. Her role, however, did not at any point encompass billing or the management of billing systems at Fairview, a function that was assigned to a billing director, Paula Gadomski.

17. Ms. Kuchy was never based on-site at Fairview Urgent Care, and only visited the clinic periodically until the onset of the COVID-19 pandemic in March 2020, at which point her engagement with Fairview became exclusively remote.

18. Dr. Tamica White was hired in 2017 as a staff physician for Fairview Urgent Care. Dr. White is a surgeon specializing in gastrointestinal disorders and treatment of skin and soft tissue tumors. The clinic relied on nonphysician practitioners ("NPPs"), which include nurse practitioners, clinical nurse specialists, and physician assistants to perform the bulk of its examinations and diagnoses.

**Relevant billing regulations**

19. The United States provides health care coverage for eligible persons under two primary programs: Medicare, which covers individuals over age 65, and Medicaid, which covers low-income children and individuals whose income is below 133% of the federal poverty level. These programs are governed by the Centers for Medicare & Medicaid Services ("CMS"), which provides specific and intricate criteria for the reimbursement of providers for services insured by each entity.[1]

---

[1] Tricare reimbursement mirrors Medicare reimbursement rates.

20.     Providers at qualifying health care entities, including urgent care clinics, are required to obtain a unique identification number referred to as a National Provider Identifier.[2]

21.     Under Medicare and Medicaid, services provided by NPPs are paid at 85% of the Medicare Physician Fee Schedule ("MPFS"). Services that are rendered by NPPs as part of a "split/shared physician visit" or that occur "incident to" physicians' services may be billed at 100% of the MPFS. Both split/shared physician visits and "incident to" services are governed by physical presence and documentation requirements.

22.     A split/shared visit is defined by Medicare Part B as a "medically necessary encounter with a patient where the physician and a qualified NPP each personally perform a substantive portion of [a] visit face-to-face with the same patient on the same date of service. A substantive portion of [a] visit involves all or some portion of the history, exam, or medical decision-making key components of [a] service."[3]

---

[2] Department of Health and Human Services Centers for Medicare & Medicaid Services, Medical Learning Network, ICN 902603, August 2014, pg. 1-3.

[3] https://www.aapc.com/blog/23741-Medicare's-splitshared-visit.

23. The "incident to" rule permits NPPs to receive reimbursement at a 100% physician fee rate if the initial patient visit is performed by the supervising physician, who evaluates, diagnoses, and devises a treatment plan, and subsequent follow-up care is provided by the NPP in accordance with specific guidelines.

24. The criteria for "incident to" follow-up care require that: (1) the physician must maintain direct supervision, in that while the supervising physician need not be present in the same room as the NPP while services are rendered, the physician must be in the same physical office suite as the NPP and must be immediately available to furnish assistance during the entire course of treatment; (2) the care must be rendered on behalf of an established patient rather than a new patient; (3) the NPP must be acting solely in accordance with the existing treatment as devised by the supervising physician; and (4) the NPP must be an employee of the same practice as the supervising group.[4]

**Plaintiff Kuchy's opposition to fraudulent government billing practices by Fairview Urgent Care**

25. In late April or early May 2021, Ms. Kuchy was informed by the former billing director of Fairview Urgent Care, Paula Gadomski, that she

---

[4] Medicare Benefit Policy Manual, Ch. 15-Covered Medical and Other Health Services, 60.2, 10-01-03, Reve. 1-14-22.

8

suspected that the clinic had been engaging in an ongoing fraudulent scheme that consisted of billing CMS and private insurers for services rendered by Dr. Tamica White when, in fact, the services were performed by NPPs. Since NPPs are not generally entitled to be reimbursed at a physician's rate and their activities at Fairview Urgent Care did not satisfy the regulatory criteria for reimbursement at such a rate, Defendant's intentional false submissions resulted in overpayments from entities including the federal government.

26. Ms. Gadomski reported that an overwhelming majority of services coded in Dr. White's name were likely performed by NPPs without face-to-face contact by Dr. White as the initiating physician or in a manner that did not constitute follow-up care incident to Dr. White's initial treatment.

27. Ms. Gadomski further stated that she had been directly ordered by Nidus' CEO Dr. Greg Daniel to submit claims attributing services to Dr. White in order to keep the clinic financially viable by recouping a universal 100% physician reimbursement rate for Fairview's services.

28. Ms. Kuchy immediately confronted Dr. Daniel with the information regarding fraudulent billing practices at Fairview. His response was that Nidus

"needed all the money we can get out of Fairview," and that he had no intention of changing its current billing practices.

29. In June and July 2021, Ms. Kuchy undertook her own inquiry into Ms. Gadomski's claims. She verified with CureMd, Fairview's new vendor for billing services, that Fairview coded all or virtually all its inpatient services to Dr. White. Ms. Kuchy further ran analytics on claims data submitted during the four years of Fairview's existence and discovered the number of claims identifying Dr. White as the billing provider exponentially exceeded the number of hours Dr. White logged at the clinic as reflected in Dr. White's payroll records.

30. Ms. Kuchy confronted Dr. White in the summer of 2021 about the evidence of fraudulent billing at Fairview. Dr. White acknowledged that she had signed all medical records underlying claims submissions but insisted that she had no knowledge as to how claims were billed. Dr. White admitted that she spent minimal time in the clinic, only a few hours every week by her description.

31. Ms. Kuchy spoke with Dr. Daniel in July 2021 upon completion of her review of billing analytics and Dr. White's scheduling records and, once again, Dr. Daniel reiterated his refusal to order a change in billing practices. Dr. Daniel

instructed Ms. Kuchy to "get over it" or "live with this" and continued to emphasize Fairview's thin financial margins.

32. During her reporting of improper billing practices to Dr. Daniel, Ms. Kuchy directly addressed the legal risk to Nidus from false billing to government payors like Medicare. Dr. Daniel's extensive knowledge of the business model for urgent care clinics would have included a threshold understanding that such clinics, including Fairview, regularly bill to Medicare or Medicaid.

33. Dr. Daniel was also fully aware that Dr. White's physical presence at Fairview was minimal and intermittent. Ms. Kuchy had extensive discussions with him in late spring of 2021 regarding the fact that Fairview could not obtain a payor contract with Blue Cross/Blue Shield for the very reason that Fairview did not employ an onsite physician during all operating hours, which Blue Cross/ Blue Shield requires of contracting clinics.

34. Just as Dr. Daniel instructed Ms. Kuchy to ignore evidence of fraudulent billing practices, he directed her to falsify the contractual application for Blue Cross/Blue Shield. She refused.

35. Once Ms. Kuchy reported fraudulent billing, including overbilling to the federal government, Dr. Daniel took immediate retaliatory steps, reducing her

pay in June by $3000.00. In the summer of 2021, he also reneged on a commitment to repay Ms. Kuchy for approximately $8,000.00 of expenses she had personally accrued on behalf of the company, including travel costs for participating in a trial in New York involving misconduct accusations against Dr. Daniel.

### Additional fraudulent submissions by Nidus to a government entity

36. As a response to the dramatic contraction in the U.S. economy in the immediate aftermath of the COVID-19 pandemic, Congress enacted emergency legislation in the form of the Paycheck Protection Program ("PPP").[5] The PPP permitted businesses of fewer than 500 employees to obtain loans to cover authorized costs including payroll with provisions for partial or full forgiveness if the business maintained its employee count and employee wages at certain levels.

37. Nidus applied for and obtained a PPP loan in 2020. In furtherance of its effort to obtain a more favorable employee count, Nidus suddenly reclassified Ms. Kuchy as a part-time salaried employee of Fairview Urgent Care and reallocated her compensation to a 50% split between Fairview and Nidus. Ms. Kuchy's responsibilities at the company in no way changed, meaning that her

---

[5] Sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Pub. L 116-136, 134 Stat. 281 (2020).

involvement in Fairview's operations did not expand in this same period, and her scope of duties were not divided evenly between Fairview and Nidus.

### **Termination by Nidus**

38.     In late July 2021, Ms. Kuchy concluded that her continued presence at Nidus was untenable given the company's willingness to sanction and engage in illegal practices including fraudulent billing. She retained legal counsel to advise her of her options.

39.     On August 2, 2021, Ms. Kuchy's then-attorney sent a letter memo to the corporate headquarters at Nidus outlining in detail Ms. Kuchy's discovery of fraudulent billing of Medicare and Medicaid as well as Nidus' deliberate misclassification of her employment status for purposes of avoiding loan repayments under the PPP.  The letter expressly described Nidus' potential liability under the False Claims Act as well as other federal statutes including the Internal Revenue Code and the Fair Labor Standards Act.

40.     The letter from Ms. Kuchy's attorney arrived via FedEx at 10:11 AM on August 2, 2021. At 12:05 PM, less than two hours later, Ms. Kuchy's access to her work emails was terminated, as was her access to all Nidus systems. She received her final paycheck from Fairview approximately a week later but never

received additional consultant's fees. Since August 2, 2021, Ms. Kuchy has received no communications from Nidus or Dr. Daniel, or any assignments of duties.  As of August 2, 2021, Ms. Kuchy was effectively terminated from her employment at Nidus.

### **Overview of fraudulent billing of Medicare and Medicaid**

41. From August 1, 2020, to July 31, 2021, Nidus billed for 15,139 patient encounters by Dr. White, or 291 claims a week. This translates to 58 encounters a day. Dr. White's payroll records for the exact same one-year period of review establishes that she worked a combined total of 176.8 hours, which translates to 3.68 hours a week in a typical four-week month.

42. Nidus' billing records from its 2017 opening to July 31, 2021 and excerpts from Dr. White's payroll records were provided by Ms. Kuchy in 2022 for review by Christina Melnykovych, a certified fraud examiner and accredited health care fraud examiner.  Ms. Melnykovych has an extensive background in health care fraud investigation, medical coding practices, and billing regulations for Medicare, Medicaid, and Tricare. She is the principal founder and CEO of Coding Continuum, Inc., and has served in her career as the Director of Health Information and Outcome Management at the University Medical Center in Tucson, Arizona

and as Vice President of Medicare for King County Medical Blue Shield in Seattle, Washington. *See* Ex. A at pgs. 2-4.

43. Ms. Melnykovych observed that her review of the billing records and relevant excerpts of Dr. White's medical records led her to conclude that: (1) it is more likely than not that the care rendered by NPPs at Fairview Urgent Care was not supervised by a physician in a manner compliant with CMS' "incident to" billing regulations; and (2) that it is more likely than not that Fairview overbilled for services actually performed by NPPs. *See* Ex. A at pgs. 11-12. As a result, Fairview routinely received overpayments for its services insured by entities including government payors.

## COUNT I

### (Violation of the Retaliation Provision of the False Claims Act, 31 U.S.C.A. §3730 (h))

44. Plaintiff incorporates by reference paragraphs 1-43 in this complaint.

45. Plaintiff identified and reported to Defendant's higher-level management a scheme of systematic fraudulent billing practices in which its subsidiary, Fairview Urgent Care, would routinely submit claims to the Centers for Medicare & Medicaid Services for payments for services rendered by a physician when in fact those services were rendered by nonphysician practitioners who were

not entitled to be reimbursed at a physician's rate and did not satisfy the regulatory criteria for reimbursement at such a rate.

46. Plaintiff further complained to higher-level management about Defendant's erroneous reclassification of her compensation structure for the sole purposes of obtaining more favorable treatment from the Paycheck Protection Program.

47. Plaintiff's opposition to and reporting of Defendant's submission of false financial claims to the U.S. Government was based on a reasonable belief that Defendant's fraudulent conduct constituted violations of the False Claims Act. 31 U.S.C.A. §3729.

48. Plaintiff engaged in acts to stop one or more violations of the False Claims Act, 31 U.S.C.A. §3730(h)(1).

49. Defendant terminated Plaintiff because she engaged in acts to stop one or more violations of the False Claims Act.

50. Defendant's retaliatory conduct has inflicted damages on Plaintiff, including but not limited to loss of back pay, remuneration, front pay, and benefits

of employment, liquidated damages and compensatory damages related to mental anguish, emotional distress, costs of litigation, and attorneys' fees.

## PRAYER FOR RELIEF

Wherefore, Plaintiff demands a trial by jury and that the following relief be granted:

A. Back pay, front pay, and lost benefits, including liquidated damages;

B. Compensatory damages to the extent allowed by law;

C. Attorneys' fees and costs of litigation;

D. Prejudgment and post-judgment interest at the highest lawful rate; and

E. Such other equitable and monetary relief as the Court deems just and proper.

Respectfully submitted on the 21st day of March, 2022.

**HKM Employment Attorneys LLP**
*s/Artur Davis*
Artur Davis[6]
ASB-3672-D56A
2024 3rd Ave. North Suite 307
Birmingham, AL 35203
205-881-0935
adavis@hkm.com
Jermaine "Jay" Walker

---

[6] Mr. Davis will promptly file for admission to practice pro hac vice in this cause of action.

                         Georgia Bar No. 142044
                         3355 Lenox Rd. NE Suite 705
                         Atlanta, GA 30326
                         404-301-4020
                         jwalker@hkm.com